UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-10600-GAO

RICHARD O'BRIEN,
Plaintiff,

v.

MICHAEL O'HARA, JAMES BULMAN, and MARK HAMACHER,
Defendants.

## ORDER ADOPTING REPORT AND RECOMMENDATION
March 31, 2014

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has filed a Report and Recommendation ("R&R") with respect to the defendants' motion for summary judgment. The R&R recommends that summary judgment be granted in favor of the defendants as to all counts of the complaint, except as to so much of Count I as alleges that the traffic stop conducted by Officers Mark Hamacher and Michael O'Hara violated the plaintiff's Fourth Amendment rights against unreasonable seizure. The defendants filed an objection to the R&R to the extent that it recommends denial of summary judgment as to that issue. The plaintiff filed a response[1] to the objection, contending that summary judgment should be denied as to all counts.

After careful review of the R&R and responsive briefing by the parties, I conclude that summary judgment should be granted in favor of the defendants as to all counts of the complaint.

---

[1] The plaintiff did not file an objection to the R&R during the time allotted but instead included his objections in his response to the defendants' objection. Because the plaintiff is proceeding *pro se*, his objections will be considered notwithstanding any procedural defect.

Under Terry v. Ohio, 392 U.S. 1 (1968), an officer may conduct a brief investigatory stop of a vehicle if the officer has a "reasonable suspicion" of criminal activity. United States v. Wright, 582 F.3d 199, 205 (1st Cir. 2009). "Whether a reasonable suspicion exists is treated as an objective inquiry: the actual motive or thought process of the officer is not plumbed." Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004) (citing Whren v. United States, 517 U.S. 806, 813 (1996)) (holding that reasonable suspicion existed where officer likely "lacked any proper intent, but a reasonable police officer could have performed a lawful Terry stop based on what [the officer] knew"). "Police officers are not limited to personal observations in conducting investigatory activities, and reasonable suspicion for a Terry stop may be based on information furnished by others." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).

The magistrate judge recommended that summary judgment be denied as to the traffic stop, concluding that genuine issues of material fact existed as to whether the Terry stop of the plaintiff's vehicle violated his Fourth Amendment rights. After reviewing the record, I am satisfied that there is no genuine issue of fact as to whether there was an objectively reasonable suspicion on the part of the officers who engaged in the stop that the plaintiff was operating his motor vehicle without a valid license. There is *no* dispute that the plaintiff was operating the car without a valid license. The only concern the magistrate judge had was whether it was clearly not in dispute that the officers knew or suspected that before stopping the car. Defendant Hamacher's affidavits aver that he called dispatch and learned of the invalid license before stopping the car. Essentially, the plaintiff's only substantive response to that factual assertion is to doubt it; he has no factual evidence to the contrary. That is not sufficient to create a genuine dispute of fact.

In any event, as the magistrate judge also noted (R&R at 15 (dkt. no. 53)), the police had reason to stop the defendant to inquire into a possible violation of Mass. Gen. Laws ch. 266, § 126, which punishes unauthorized posting of signs or notices on private or municipal property, or a similar town ordinance. There is also no dispute on the record that Hamacher (and O'Hara) knew who the plaintiff was. A Terry stop would have been warranted on this basis, as well as the unlicensed operation basis.

Indeed, it is the plaintiff who asserts that Hamacher and O'Hara stopped his vehicle "for the sole purpose of harassing and intimidating the Plaintiff for exercising his rights to free speech." (Compl. at ¶ 27 (dkt. no. 1-3).) He testified at his deposition that two police cruisers waited as he exited Tedeschi's, followed his car from the parking lot, and then pulled him over, the implication being that the officers knew who he was and specifically targeted his vehicle. It is pretty clear he does not dispute that they knew who he was and that they wanted to talk to him about his distributing his flyers. I conclude that the stop at issue was supported by reasonable suspicion on two grounds and therefore did not violate the plaintiff's Fourth Amendment rights.

As to the other counts, the plaintiff repeats arguments that the magistrate judge already addressed in the R&R. For example, the plaintiff objects to the magistrate judge's conclusion that the search of his vehicle pursuant to a standardized inventory policy was proper, arguing that Hamacher failed to follow proper procedures. The plaintiff points to various indicia that the inventory search was not carried out pursuant to a standardized policy, such as the fact that no other items were removed from his vehicle, though they are of monetary value and the flyers are not, and the fact that the inventory sheet and vehicle tow/impoundment record were left blank. However, the magistrate judge properly concluded that despite these technical defects, the inventory search at issue here did not violate the plaintiff's Fourth Amendment rights.

Accordingly, I ADOPT the R&R in all respects except its proposed denial of summary judgment on the Fourth Amendment claim. As to that claim, I conclude that the defendants are entitled to summary judgment in their favor as well. The defendants' Motion (dkt. no. 18) for Summary Judgment is GRANTED in its entirety. Judgment shall enter for the defendants.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

# United States District Court
# District of Massachusetts

RICHARD O'BRIEN,
    Plaintiff,

    v.                                 CIVIL ACTION NO. 12-10600-GAO

MICHAEL O'HARA,
JAMES BULMAN,
MARK HAMACHER,
    Defendants.

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT (#18)

COLLINGS, U.S.M.J.

### I. Introduction

*Pro se* plaintiff Richard O'Brien ("O'Brien") has filed a four-count complaint against three Scituate Police Officers (collectively "the defendants"), Michael O'Hara ("O'Hara"), James Bulman ("Bulman"), and Mark Hamacher ("Hamacher"). The claims alleged are: Count I for liability under 42 U.S.C. § 1983 for violations of the First, Fourth and Fourteenth Amendments; Count II

for liability under the Massachusetts Civil Rights Act; Count III for intentional infliction of emotional distress; and Count IV for liability under 42 U.S.C. § 1983 for civil conspiracy.

Following the close of discovery, on May 8, 2013 the defendants filed a motion for summary judgment (#18) together with a memorandum of law (#19) and a statement of undisputed facts (#20). Initially O'Brien filed his motion for opposition to the dispositive motion on October 28, 2013. (#33) The plaintiff thereafter submitted another opposition (#40) and a memorandum in opposition to the summary judgment motion (#41).[1] On February 24, 2014, at the Court's request the defendants filed the complete transcript of the plaintiff's deposition ("Plaintiff's Depo.") and then on February 26th that of defendant Bulman.

At this juncture, the record is complete and the motion for summary judgment stands ready for resolution.[2]

---

[1]

On November 21, 2013, the defendants moved to strike the opposition and memorandum filed by the plaintiff on November 14th. (#42) The motion to strike was denied, with the defendants being afforded the opportunity to file a reply brief if they deemed it advisable. (#50) No reply brief has been filed.

[2]

On December 3, 2013, the defendants' motion for summary judgment was referred to the undersigned for the issuance of a report and recommendation on disposition. (#44)

## II. Factual Background[3]

This civil action arises out of the events surrounding the arrest of O'Brien on March 14, 2009.

On or about March 10, 2009, the plaintiff commenced a flyer campaign[4] against William LaSala ("LaSala")[5] .(#20 ¶ 4; #41 ¶ 18)  The flyer read as follows:

> Pedophile Watch For Scituate
> William La Sala, the 'Country Way Pedophile,' age 51, never married, described by experts as mentally ill and a 'textbook pedophile,' suffers from foot and sock fetish, mixes religion and sex to manipulate, places photos of other people's children on his internet site, W/O the knowledge of parents, and moved to Scituate

---

[3]

The plaintiff has not filed "a concise statement of material facts of record as to which it is contended that there exists a genuine issue of issue to be tried" as required by Local Rule 56.1. "A *pro se* litigant must comply with a district court's procedural rules, as well as the Federal Rules of Civil Procedure." *Fleming v. Magnusson*, 52 F.3d 309 (Table), 1995 WL 238669, *2 (1 Cir., Apr. 25, 1995); *FDIC v. Anchor Properties*, 13 F.3d 27, 31 (1 Cir., 1994). In his memorandum, O'Brien does dispute certain of the facts in the defendants' statement of undisputed material facts of record. To the extent O'Brien's disputes are properly presented, they shall be considered. To the extent the plaintiff "fails to properly address [the defendants'] assertion of fact as required by Rule 56(c)," the Court shall "consider the fact undisputed for purposes of the [summary judgment] motion." Fed. R. Civ. P. 56(e).

[4]

Prior to the flyer campaign, O'Brien had grown suspicious of William LaSala's relationship with his, O'Brien's, children. (#20 ¶ 3; #20-1 at 85)  As a result of these suspicions, the plaintiff had complained to officers in the Scituate Police Department ("SPD"), including defendant Bulman. (#20 ¶ 2; #20-1 at 86-88)  In response to these complaints, the SDP conducted a standard background search on LaSala. (#20 ¶ 4)  Based on this investigation, the SPD concluded that there was no reason to suspect LaSala was a threat to the plaintiff's children. (#20 ¶ 4; #20-1 at 89-90)  Although O'Brien seems to dispute these facts (#41 ¶ 7), they are supported by his own deposition testimony.

[5]

LaSala was O'Brien's ex-wife's boyfriend. (#20-1 at 85; # 20 ¶ 3; # 4 ¶ 2)

3

> from his mom's house in Brooklyn to be near my young
> boys. This is in open defiance of a civil restraining
> order prohibiting any contact, (once the court
> discovered LaSala drew a picture of my 5 year old
> holding a penis). The police and school administrators
> state they can't do anything. LaSala has been spotted
> at the purple dinosaur playground and on the grounds
> of Hatherly Elementary School. If you observe this
> man with *any* children, please email me with details,
> including date and time, at brownie2wit2@yahoo.com
> Thank you.

#20-2 at 5.

O'Brien posted these flyers on public structures and distributed them to the community. (#20 ¶ 5; #20-1 at 154-56)  On March 14, 2009, LaSala reported the flyers to Bulman, and Bulman verified that O'Brien was responsible for them. (#20 ¶¶ 7-8; #20-1 at 179)  Bulman unsuccessfully attempted to reach out to O'Brien at his home to question him about the flyers. (#20 ¶ 8; #20-1 at 179)  That evening at roll call Bulman briefed the late shift officers, including defendants Hamacher and O'Hara, about the flyers and his inability to find O'Brien to discuss the flyers. (#20 ¶ 10; #20-2 ¶ 8)

During his patrol that same evening, Hamacher observed what he believed to be O'Brien's vehicle. (#20 ¶ 10) According to Hamacher, in order to confirm his belief, he called dispatch whereupon he learned that it was O'Brien's vehicle and, further, that the plaintiff's license had expired. (#20 ¶ 10)

Further, according to Hamacher, O'Brien was then stopped,[6] and, after inspecting the plaintiff's license and confirming that the license had, in fact, expired, Hamacher arrested O'Brien for driving with an expired license, a violation of Mass. Gen. L. c. 90 § 10. (#20 ¶ 11; #20-1 at 167; #41 ¶ 13)

Having responded to Hamacher's request for back-up, O'Hara was present at O'Brien's arrest; Bulman was not. (#20 ¶¶ 11, 15; #41 ¶ 13)  During the course of the stop and arrest, Hamacher noted that the inspection sticker on the plaintiff's vehicle had expired. (#20 ¶ 12; #20-1 at 171-72)  Consequently, Hamacher issued a citation for that infraction as well.  (#20 ¶¶ 12, 13)  The plaintiff was ultimately found responsible for having no inspection sticker and fined $50, and the charge of operating without a license was dismissed with the payment of $100 in court costs. (#20-4; #20-1 at 178)

O'Brien points out that his version of events *vis-a-vis* his arrest as related in his deposition testimony (#41 ¶¶ 12-13) differs from that of Hamacher. (*compare* #20-1 at 166-69 with #20-3 ¶¶ 3-5))  In his deposition, the plaintiff testified as follows:

> Q. What was the first interaction with the police on that date?

---

[6]

As noted, *infra,* this sequence is disputed by the plainitff.

A. Well the first interaction was when I left Tedeschi's with my one percent milk, and I observed two cruisers to the left of me when I exited Tedeschi's . . . . So I drove past them and exited. They were on my right as I passed out of the lot . . . . And I got up to the set of lights and just then it was about to turn red. I pivoted right. I used my signal. As I was doing that I saw lights approach at a very high rate of speed. And I pulled over right around the corner there . . . . and a cruiser pulled up right behind me with the spotlight on and then I could barely see another cruiser behind that one.

Q. Let me give you another question. With which officer did you first interact?

A. The first officer I interacted with was Officer O'Hara.

Q. Did he walk up to your vehicle?

A. Yes.

Q. Did he speak to you through the driver's window while you were in the vehicle?

A. The window I had rolled down, yes.

Q. Did he ask for license and registration?

A. Yes.

Q. Did you provide those?

A. Yes.

Q. Did you have a valid license that day?

A. No.

Q. So the vehicle was uninspected and you were unlicensed?

A. Correct.

Q. After you produced the license to Officer O'Hara, did he comment to you that you were unlicensed?

A. Yes.

Q. Did he say anything else at that point?

A. He asked about whether or not I was handing out flyers, the flyers, did I have the flyers.

Q. Did you know what he meant?

A. Oh, yes. And I asked him if that was why he pulled me over. And at that time Officer Hamacher was behind us with a spotlight, a flashlight looking around the perimeter, the back area of the van. And he didn't respond other than to say basically this is about the flyers. Where are they?

Q. Who said that to you?

A. O'Hara.

Q. Go ahead, sir. What happened next?

A. So at that point in time O'Hara walked away with the license, Hamacher was there, but O'Hara walked away with the license and registration. And the next thing I remember is they placed me under arrest. I asked them why they were arresting me, and O'Hara

said in particular as I recall, we are working on that.
So I was out in the back seat of O'Hara's cruiser.

#20-1 at 166-69.

Hamacher remained with the plaintiff's vehicle waiting for it to be towed while O'Hara transported O'Brien to the police station. (#20 ¶ 16) Hamacher observed the LaSala flyers in O'Brien's vehicle and seized them. (#20 ¶ 17) The plaintiff testified that the flyers "were under the front seat area, under several newspapers," the front seat area meaning "between the bottom of the seat and the floor." (#20-1 at 172) While Hamacher disputes this testimony, he "accepts it as true for purposes of summary judgment only." (#20 ¶ 17) Neither O'Hara nor Bulman were present at the time the flyers were seized from the plaintiff's vehicle. (#20 ¶ 19)

In March of 2009, the Scituate Police Department ("SPD") had in effect a written Motor Vehicle Inventory policy which mandated that "[a]ll motor vehicles ordered towed by the Scituate Police Department will have an inventory of motor vehicle form completed by the assigned officer. This is not an option and shall be completed each and every time a vehicle is towed." (#20-5) The policy required "[t]he inventory listing of personal items and valuables . . . [in] all open areas, including the area under the seats." (#20-5)

The defendants have submitted only a blank inventory form, not an inventory form completed with respect to the plaintiff's vehicle. (#20-5; #41 ¶¶ 14-16)

At some point after O'Brien's arrest, Bulman applied for a criminal complaint on charges related to the flyers in the Hingham District Court, and the court sent a summons to O'Brien. (#20 ¶ 21; #20-2 ¶ 10) The plaintiff was not arrested on these charges; he was summonsed to court on them. (#20 ¶ 21; #20-1 at 178; #20-2 ¶ 12) After a hearing before a clerk magistrate at the Hingham District Court, the clerk magistrate declined to issue a criminal complaint on the charges for which Bulman had applied. (#20 ¶ 22; #20-1 at 178-79; #20-2 ¶ 13) Neither Hamacher nor O'Hara was involved in seeking the criminal complaint against O'Brien. (#20-2 ¶ 11)

On July 26, 2009, O'Hara stopped the plaintiff in his vehicle and, after observing his inspection sticker was expired, issued O'Brien a citation for the expired sticker. (#20 ¶ 24; #20-1 at 182-84) The plaintiff admits that, at that time this citation was issued, the inspection sticker on his vehicle was still expired. (#20-1 at 181, 184)

### III. Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the

pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1 Cir., 2005) (internal quotations marks and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1 Cir., 2003)(citations omitted); *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1 Cir., 2010).

Once the moving party alleges the absence of all meaningful factual disputes, the non-moving party must show that a genuine issue of material fact exists. This showing requires more than the frenzied brandishing of a cardboard sword. The non-moving party must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefrom to forestall

---

[1] Rule 56 was amended effective December 1, 2010. The summary judgment standard is now set forth in Rule 56(a), but "[the standard for granting summary judgment remains unchanged." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 n.4 (1 Cir., 2011).

the entry of summary judgment. *Certain Interested Underwriters at Lloyd's, London v. Stolberg,* 680 F.3d 61, 65 (1 Cir., 2012)(internal citations and quotation marks omitted); *Fontánez-Núñez v. Janssen Ortho LLC,* 447 F.3d 50, 54-55 (1 Cir., 2006).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart,* 449 F.3d 276, 280 (1 Cir., 2006); *Guay v. Burack,* 677 F.3d 10, 13 (1 Cir., 2012). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris,* 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986))(further internal quotation marks omitted).

## IV. Discussion

## A. Count I: Alleged Violation of O'Brien's First and Fourth Amendment Rights

### 1. Traffic Stop as a Fourth Amendment Violation

In his complaint, O'Brien alleges that the defendants' actions, including that "[o]n or about March 14, 2009, Officers Hamacher and O'Hara located and followed Plaintiff's vehicle and then stopped Plaintiff near his home" (#1-3 ¶ 10), violated his Fourth Amendment "right to be free from unreasonable search and seizure and unlawful arrest." (#1-3 ¶ 27) These allegations, coupled with the plaintiff's reference to his account of the traffic stop and arrest (#41 ¶ 12) in his memorandum in opposition, can be read as a challenge to the constitutionality of the stop of his vehicle.[2]

In seeking summary judgment, the defendants have failed to establish that the stop of O'Brien's car was not violative of the Fourth Amendment. Quite recently the First Circuit reviewed the legal parameters of a warrantless traffic stop:

> In *Terry v. Ohio* the Supreme Court articulated the watershed principle that a police officer may in

---

[2] The Court is "required to construe liberally a pro se complaint . . . The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1 Cir., 1997), *cert. denied*, 522 U.S. 1148 (1998). While O'Brien may have been represented by counsel at the outset of this litigation, he is currently proceeding *pro se*.

appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. Temporary traffic stops are analogous to these so-called *Terry* stops. Stopping a vehicle and temporarily detaining its occupants constitutes a seizure for Fourth Amendment purposes. Because the defendants, as passengers in the stopped automobile, were seized within the meaning of the Fourth Amendment, they may contest whether the stop of the vehicle meets Fourth Amendment standards.

A warrantless traffic stop satisfies the Fourth Amendment's reasonableness requirement, U.S. Const. amend. IV, if police officers have a reasonable suspicion of wrongdoing — a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime. To constitute reasonable suspicion, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.

The Supreme Court has eschewed, emphatically, any reliance on a rigid test or formula to give the concept substance. Rather, it has emphasized that the determination must be grounded in the totality of the circumstances. Nevertheless, the Court has disciplined the reasonable suspicion standard by requiring some objective manifestation that the person stopped either is wanted for past criminal conduct, or is engaging or about to engage in such conduct. A mere hunch, therefore, will not justify a stop.

*U.S. v. Campbell*, 741 F.3d 251, 260-61 (1 Cir., 2013) (internal citations and quotation marks omitted).

The defendants have not proffered an affidavit from O'Hara, so his version of events is unknown. In his affidavit, Hamacher states as follows:

> 3. While on patrol that evening [March 14, 2009], I observed a vehicle which I believed to be O'Brien's, and requested that the dispatcher check registry records to confirm that the vehicle was O'Brien's. After performing the check, the dispatcher informed me that O'Brien's driver's license had expired.
>
> 4. I stopped the vehicle and asked O'Brien to produce his driver's license. I confirmed that the driver's license was expired, and confirmed that O'Brien knew the license was expired. I then arrested O'Brien for operating a motor vehicle while unlicensed, pursuant to G.L. c. 90, § 10.

Affidavit of Mark Hamacher #20-3 ¶¶ 3-4.

Hamacher does not provide "specific, articulable reasons" for his belief that the vehicle belonged to O'Brien. *U.S. v. Lee*, 317 F.3d 26, 31 (1 Cir.), *cert. denied*, 538 U.S. 1048 (2003); *Campbell*, 741 F.3d at 261. Further, Hamacher does not explicitly state when the call to the dispatcher was made in relation to the stop. Taking the facts in the light most favorable to the plaintiff, based on O'Brien's deposition testimony, Hamacher could well have been calling dispatch from his patrol car after the stop was made while O'Hara approached the

vehicle and asked the plaintiff for his license and registration.

If the stop was made prior to the time that Hamacher knew the vehicle belonged to O'Brien and that O'Brien was unlicensed, to wit, before the call to the dispatcher, the defendants have not articulated any basis for having a "reasonable suspicion of wrongdoing" in order to justify a stop within the confines of the Fourth Amendments.[3] *Campbell*, 741 F.3d at 261; *Lee*, 317 F.3d at 31. *Compare, e.g., Kenney v. Floyd*, 700 F.3d 604, 608 (1 Cir., 2012) ("Under the Fourth Amendment, the initial traffic stop must have been supported by a reasonable suspicion that a traffic violation occurred. . . . It was undisputed that the radio transmissions from Officer McKay's cruiser establish that he called in to report a stop of Kenney, acknowledged that Kenney had a passenger, and *stated that the basis for the stop was Kenney's expired vehicle registration.*" (emphasis added)). Because genuine issues of material fact exist as to whether the stop of O'Brien's vehicle on March 14, 2009 violated the Fourth Amendment, summary judgment for defendants Hamacher and O'Hara on that

---

[3] Had Hamacher explained in his affidavit (#20-3) the facts underlying his belief that the vehicle belonged to O'Brien, i.e., perhaps he and O'Brien had had prior dealings or O'Brien's vehicle was described at roll call, etc., he likely would have had reasonable suspicion to stop the plaintiff based on the information he had received from Bulman at roll call, to wit, that O'Brien was suspected of posting flyers on utility poles and other public places in violation of Mass. Gen. L. c. 266 § 126. If Hamacher did, in fact, have specific, articulable facts which provided him reasonable suspicion that the vehicle was O'Brien's before O'Brien was stopped, defendants' counsel was remiss in not placing them in the record before the Court. But as the record now stands, there are none.

claim should be denied.

"[C]ase law requires a separate assessment of the potential liability of each of the defendants." *Grajales v. Puerto Rico Ports Authority,* 682 F.3d 40, 47 (1 Cir., 2012). "'It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Leavitt v. Correctional Medical Services, Inc.,* 645 F.3d 484, 502 (1 Cir., 2011) (emphasis in original) (quoting *Rogan v. Menino,* 175 F.3d 75, 77 (1 Cir.), *cert. denied,* 528 U.S. 1062 (1999)). In this case, although the illegal traffic stop claim is also alleged against defendant Bulman, it is undisputed as a matter of fact that Bulman was not at the scene and was not involved in the decision to stop the plaintiff's vehicle. (#20-1 at 177, 191-92) Consequently, Bulman is entitled to the entry of judgment as a matter of law in his favor on the Fourteenth Amendment, illegal traffic stop claim.

### 2. Warrantless Arrest of O'Brien as a Violation of the Fourth Amendment

O'Brien contends that the March 14th arrest violated his Fourth Amendment right to be free from improper search and seizure. A warrantless arrest without probable cause that criminal activity has been or is being committed is a violation of the Fourth Amendment. *See Devenpeck v. Alford,*

543 U.S. 146, 152 (2004); *Robinson v. Cook*, 706 F.3d 25, 33 (1st Cir.), *cert. denied* — U.S.— , 133 S.Ct. 2831 (2013). Probable cause for a warrantless arrest exists "where reasonably trustworthy facts and circumstances would enable a reasonably prudent person to believe that the arrestee has committed a crime (even if it differs from the one named by police during the arrest or booking)." *Robinson*, 706 F.3d at 33 (citations omitted).

Under Massachusetts law, driving with an expired license is an arrestable offense. *See* Mass. Gen. L. c. 90 §§ 10, 23. According to O'Brien, it was O'Hara who first approached him after the stop and requested his license and registration. Upon receiving the license, O'Hara asked the plaintiff if he knew he was unlicensed. It was after that query that O'Brien saw Hamacher approach.[12]

---

[12]

> In his opposition, O'Brien states as follows:
>
> > Arriving at the local convenience store on the night of his arrest (where plaintiff purchased milk), he observed defendant Hamacher in one police cruiser parallel to a second police cruiser. Hamacher's window was down; he was conversing with the second officer, who turned out to be Sgt. O'Hara. Both officers pursued the plaintiff as he drove away from the store, and almost immediately stopped him. These officers were working together from the get-go; there was no call by Hamacher for back-up. *There was, by extension, no taped radio transmission to be had, according to police at the time, of defendant Hamacher calling O'Hara for back-up.*
>
> #41 ¶ 13 (emphasis in original).
>
> Unlike the plaintiff's deposition testimony, these statements are not sworn or made under the penalty of perjury. At best, they are supposition. Even if they were to be considered, the contentions simply do not address Hamacher's statement that the dispatcher confirmed that it was O'Brien's vehicle and that O'Brien's license was expired.

Although the plaintiff's recount of his arrest differs from that of the defendants, nothing in O'Brien's deposition testimony challenges the fact that on March 14, 2009, Hamacher was advised by the dispatcher that registry records confirmed the vehicle did belong to O'Brien and, further, that O'Brien's driver's license had expired. (#20 ¶ 10) Because it is undisputed that Hamacher's knowledge of the fact that the plaintiff was unlicensed derived "from an independent source," the dispatcher, and did not result from the potentially illegal stop, the evidence of probable cause is not tainted and need not be excluded. *Wong Sun v. U.S.*, 371 U.S. 471, 485 (1963) (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)).

The plaintiff concedes that he did not possess a valid license when he was stopped by the Scituate Police on March 14, 2009. (#20-1 at 167) In light of the attendant circumstances and the plaintiff's admission, it is clear that there was probable cause to arrest O'Brien for unlicensed driving. Summary judgment should be entered in favor of O'Hara and Hamacher on this claim.

As with the prior claim, although the warrantless arrest claim is also alleged against defendant Bulman, it is undisputed as a matter of fact that Bulman was not involved in the decision to arrest, nor the actual arrest, of the

plaintiff. (#20-1 at 177, 191-92) Consequently, Bulman is entitled to the entry of judgment as a matter of law in his favor on the Fourteenth Amendment, warrantless arrest claim.

### 3. The Warrantless Arrest of O'Brien as a Violation of the First Amendment [13]

O'Brien contends that he was arrested for exercising his First Amendment right to free speech, to wit, engaging in his flyer campaign. (#41 ¶ 26)  To establish successfully a First Amendment retaliation claim, O'Brien must show a casual connection between (1) his constitutionally protected conduct and (2) the defendants' adverse behavior. *See Pierce v. Cotuit Fire District*, 741 F.3d 295, 301-02 (1 Cir., 2014); *Welch v. Ciampa*, 542 F.3d 927, 936 (1 Cir., 2008)(citing *Mt. Healthy City Sch. Dist. Bd. of Edu. v. Doyle*, 429 U.S. 247, 287 (1977)).

Prior to reaching the merits of the claim, the Court may first address the question of qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 239 (2009). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, -U.S. -,

---

[13] In his complaint, the plaintiff alleges that "[t]he Defendants' actions were undertaken for the sole purpose of harassing and intimidating the Plaintiff for exercising his rights to free speech and to peaceably assemble guaranteed in the First Amendment." (#1-3 ¶ 27)  Since the plaintiff has submitted no facts or advanced any arguments relating to the right to assemble peaceably, the claim should be deemed waived.

132 S.Ct. 2088, 2093 (2012) (citations omitted); *Cortes-Reyes v. Salas-Quintana*, 608 F.3d 41, 51 (1 Cir., 2010). The defendants argue that the instant case is one where the Court may "quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Pearson*, 555 U.S. at 239.

In *Reichle*, the Supreme Court

> granted certiorari on two questions: whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest, and whether clearly established law at the time of Howards' arrest so held. If the answer to either question is 'no,' then the agents are entitled to qualified immunity. We elect to address only the second question.

*Reichle*, 132 S.Ct. at 2093 (internal citation omitted).

In answering the second question, the Supreme Court "conclude[d] that, at the time of Howards' arrest, it was not clearly established that an arrest supported by probable cause could violate the First Amendment." *Id.* According to the Court, its 2006 decision in *Hartman v. Moore*, 547 U.S. 250 (2006), "injected uncertainty into the law governing retaliatory arrests." *Reichle*, 132 S.Ct. at 2096. It followed that, since the law was not clearly established at the time of

the arrest, the Secret Service agents who had effectuated the arrest were entitled to qualified immunity. *Id.*

The *Hartman* opinion issued on April 26, 2006. From that date until at least the issuance of the *Reichle* decision on June 4, 2012[14], the law was not clearly established as to whether a retaliatory arrest claim based on the First Amendment was viable when probable cause existed to support the arrest. *Id.* at 2093; *see also Abrami v. Town of Amherst*, 2013 WL 3777070, at *11(D. Mass., July 16, 2013). Since the plaintiff's arrest in the present case occurred with that time frame, and probable cause supported that arrest, defendants Hamacher and O'Hara are entitled to qualified immunity on O'Brien's First Amendment retaliatory arrest claim.

The retaliatory arrest claim is also alleged against defendant Bulman. Again, it is undisputed as a matter of fact that Bulman was not involved in the decision to arrest or the actual arrest of the plaintiff. (#20-1 at 177, 191-92) Consequently, Bulman is entitled to the entry of judgment as a matter of law in his favor on the First Amendment, warrantless arrest claim.

*4. The Search and Seizure of the Flyers as a Fourth Amendment Violation*

---

[14] Indeed, the Supreme "Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." *Reichle*, 132 S.Ct. at 2093.

While the Fourth Amendment offers protection against illegal searches, it is well established that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 367-76 (1976); *U.S. v. Richardson*, 515 F.3d 74, 85(1 Cir.), *cert. denied*, 553 U.S. 1072 (2008). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren v. U.S.*, 517 U.S. 806, 812 n. 1(1996) (citing *Opperman*, 428 U.S. at 369). The First Circuit has held that "[t]he Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to a standardized policy." *Richardson*, 515 F.3d at 85(citations omitted); *U.S. v. Hawkins*, 279 F.3d 83, 86 (1 Cir., 2002).

As has been found, the defendants had probable cause to arrest the plaintiff for being unlicensed. According to his affidavit, while O'Hara transported O'Brien to the police station after his arrest[15], Hamacher remained

---

[15] O'Brien does not dispute that O'Hara drove him in a cruiser to the SPD station after his arrest. (Plaintiff's Depo. at 168-70)

with the plaintiff's vehicle waiting for it to be towed.[16] (#20-3 ¶¶ 5-6) During the course of inspecting the windshield of the vehicle with a flashlight (at which time he observed the expired inspection sticker), Hamacher "observed on the front seat of the vehicle the flyers about which I had been informed by Officer Bulman. I removed the pamphlets from the vehicle, and they were held as evidence pending further investigation by Officer Bulman." (#20-3 ¶ 7)

The defendants have submitted only a blank "Scituate Police Department Vehicle Tow/Impoundment Record." (#20-5 at 4) The plaintiff argues that the defendants' failure to produce a "completed, signed and dated inventory sheet" relating to the search of his vehicle "is irrefutable proof that no inventory was taken." (#41 ¶ 17) Further, the plaintiff contends that the flyers were not on the front seat as claimed by Hamacher, but rather were under the passenger seat at the time of his arrest.[17] O'Brien asserts that these facts demonstrate that "his Fourth Amendment protections were violated via an unwarranted search and seizure." (#41 ¶ 17)

The plaintiff's position is unavailing. There is no dispute that the SPD has

---

[16] O'Brien does not dispute that Hamacher stayed with the plaintiff's vehicle while O'Brien was transported to the police station. (Plaintiff's Depo. at 173)

[17] For purposes of summary judgment only, the defendants accept this fact as true. (#19 at 5)

a standardized policy for inventory searches for all vehicles ordered to be towed. (#20-5) This policy provides that the search is to encompass "all open areas, including the area under the seats, the glove compartment, and other places where property is likely to be held." (#20-5 at 3) Thus, even if the flyers were under the front seat as O'Brien claims, they would nevertheless have been subject to an inventory search. Although the plaintiff argues that the police were just after the flyers, that is beside the point: "[T]he law is clear. The subjective intent of the officers is not relevant so long as they conduct a search according to a standardized inventory policy." *Hawkins*, 279 F.3d at 86 (citing *Bertine*, 479 U.S. at 373). Moreover, the First Circuit has refused to "hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search." *U.S. v. Trullo*, 790 F.2d 205, 206 (1 Cir., 1986). Thus, Hamacher's failure to complete the form is immaterial for present purposes.

In short, because Hamacher had probable cause to arrest the plaintiff for being unlicensed, and the subsequent search of his vehicle was pursuant to a standardized inventory policy, summary judgment should enter for Hamacher this Fourth Amendment claim.

The Fourth Amendment claim based on the search and seizure of the flyers is also alleged against defendants O'Hara and Bulman. It is undisputed as a matter of fact that neither O'Hara nor Bulman was involved in the decision to search and seize the flyers in the plaintiff's vehicle and, in fact, these defendants were not present at the scene when the search and seizure occurred. (#20-1 at 177, 191-92; 20-3 ¶ 5; # at 168-70) Consequently, O'Hara and Bulman are entitled to the entry of judgment as a matter of law in their favor on the Fourth Amendment, search and seizure of the flyers claim.

### 5. Application for a Criminal Complaint as a Violation of the First and Fourth Amendments

O'Brien maintains that Bulman's application for a criminal complaint relating to the flyers violated his constitutional rights. There is no dispute that the plaintiff was not arrested or detained on these charges; rather, the court issued a summons to O'Brien. (#20 ¶ 21; #20-1 at 178) The question, then, is whether merely being summonsed to court constitutes a seizure within the meaning of the Fourth Amendment. The First Circuit has held that it does not:

> [the] criminal prosecution in this case did not impose any restrictions on [the plaintiff's] liberty other than the legal obligation to appear in court at a future date. As we have stated, [the plaintiff] merely received a summons in the mail. He was never arrested on the

charges at issue. Nothing in the record indicates that he had to post a bond or to limit his travel before the ultimate hearing in which those charges were dismissed for want of prosecution. Although [the plaintiff] contends that the summons alone constituted a seizure because it threatened him with arrest if he failed to appear . . . there is no controlling authority on point. Several circuits have expressly declined to reach the issue.

In our view, the Supreme Court's Fourth Amendment jurisprudence belies [the plaintiff's] claim that he was seized. . . . But *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] cannot be read to mean that the issuance of a summons (any more than a testimonial subpoena or a call to jury duty) would constitute a seizure simply because it threatens a citizen with the possibility of confinement if he fails to appear in court.

*Britton v. Maloney*, 196 F.3d 24, 29-30 (1 Cir., 1999), *cert. denied*, 530 U.S. 1204 (2000) (internal citations omitted); *Nieves v. McSweeney*, 241 F.3d 46, 55-6 (1 Cir., 2001).

Further, the elements of a malicious prosecution claim are as follows:

To establish a claim of malicious prosecution, a plaintiff must show: '(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice.' *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir.2001) (citing *Correllas v. Viveiros*, 410 Mass. 314, 572 N.E.2d 7 (1991)). To transform a malicious prosecution into a claim cognizable under section 1983, the plaintiff must

> also demonstrate a constitutional deprivation. *Id.*;
> *Smith v. Mass. Dep't of Corr.*, 936 F.2d 1390, 1402 (1st
> Cir.1991).

*Morrissey v. Town of Agawam*, 883 F. Supp.2d 300, 311-12 (D. Mass., 2012).

The plaintiffs claim falters on the threshold element: the summons did not

serve as a "commencement" of criminal proceedings against O'Brien based on

the flyers. "The tort of malicious prosecution permits damages for a deprivation

of liberty—a seizure— *pursuant to legal process*. Generally, the offending legal

process comes either in the form of an arrest warrant (in which case the arrest

would constitute the seizure) or a subsequent charging document (in which

case the sum of post-arraignment deprivations would comprise the seizure)."

*Nieves*, 241 F.3d at 54 (internal citations omitted; emphasis in original). The

summons to the plaintiff was not the commencement to criminal proceedings

or a seizure pursuant to a legal process. In fact, because the clerk magistrate

refused the application, no criminal charges were commenced at all.

Assuming that O'Brien's claim is viewed as one for malicious prosecution

under 42 U.S.C. § 1983, it would be incumbent upon the plaintiff to "show a

deprivation of liberty, pursuant to legal process, that is consistent with the

concept of a Fourth Amendment seizure." *Harrington v. City of Nashua*, 610

F.3d 24, 30 (1 Cir., 2010) (citations omitted); *Wilson v. Teves*, 2012 WL 3763961, at *1 (D. Mass., Aug. 28, 2012). Again, the plaintiff has failed to allege or establish facts that indicate he was subjected to any Fourth Amendment seizure consequent to Bulman seeking the issuance of a complaint. From all that appears, the plaintiff's sole contention is that within a few days after his arrest, he received a complaint in the mail from the SPD charging the offense of "tagging" in violation of Mass. Gen. L c. 266 § 126B[18]   (#1-3 ¶ 14) and a summons to court for a show cause hearing on that charge. (#20-1 at

---

[18] This law provides:

> Whoever sprays or applies paint or places a sticker upon a building, wall, fence, sign, tablet, gravestone, monument or other object or thing on a public way or adjoined to it, or in public view, or on private property, such person known or commonly known as "taggers" and such conduct or activity known or commonly known as "tagging", or other words or phrases associated to such persons, conduct or activity, and either as an individual or in a group, joins together with said group, with the intent to deface, mar, damage, mark or destroy such property, shall be punished by imprisonment in a house of correction for not more than two years or by a fine of not less than fifteen hundred dollars or not more than three times the value of such damage to the property so defaced, marked, marred, damaged or destroyed, whichever is greater, or both fine and imprisonment and shall also be required to pay for the removal or obliteration of such "tagging" or to obliterate such "tagging"; provided, however that when a fine is levied pursuant to the value of the property marred, defaced, marked, damaged or destroyed or where the cost of removal or obliteration is assessed the court shall, after conviction, conduct an evidentiary hearing to ascertain the value of the property so defaced, marked, marred, damaged or destroyed or to ascertain the cost of the removal or obliteration. A police officer may arrest any person for commission of the offenses prohibited by this section without a warrant if said police officer has probable cause to believe that said person has committed the offenses prohibited by this section.

Mass. Gen. L. c. 266, § 126B.

178) "[T]he view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." *Nieves*, 241 F.3d at 55; *see also Wilson*, 2012 WL 3763961, at *1 ("the plaintiff does not allege harm consistent with the concept of a Fourth Amendment seizure.").

For all of the reasons discussed, summary judgment should enter for Bulman on the claim that the application for a criminal complaint violated the First and Fourth Amendments. Further, since it is undisputed that O'Hara and Hamacher were not involved in seeking the additional criminal charges against the plaintiff, these defendants are entitled to the entry of summary judgment in their favor on this claim.

### B. Count II: Alleged Violation of the Massachusetts Civil Rights Act

O'Brien alleges that all of the defendants violated the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. L. c. 12 §§ 11H & I. To succeed on a claim under the MCRA, a plaintiff must prove that:

> '(1) [his] exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference . . . was by threats, intimidation, or coercion.'

*Shea v. Porter*, 2013 WL 1339671, at *6 (D. Mass., Mar. 29, 2013) (quoting *Cryer v. Clarke*, 763 F. Supp.2d 237, 254 (D. Mass., 2010)); *American Lithuanian Naturalization Club, Athol, Mass., Inc. v. Board of Health of Athol*, 446 Mass. 310, 326, 844 N.E.2d 231, 243 (Mass., 2006).

"The Supreme Judicial Court of Massachusetts has interpreted the MCRA to be co-extensive with § 1983 except for two disparities: (1) the MCRA does not require any state action . . . , and (2) a claim under the MCRA requires a violation by threats, intimidation, or coercion." *Kelley v. LaForce*, 288 F.3d 1, 10 (1 Cir., 2002); *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 2008 WL 4595369, at *20 (D. Mass., Sept. 30, 2008) ("[T]here is no indication that the MCRA was intended to provide broader relief than that provided by § 1983.").

To the extent that O'Brien relies on the alleged First and Fourth Amendment violations upon which it is recommended that summary judgment enter for the defendants, his MCRA claim necessarily is without merit. *See Morrissey*, 883 F. Supp.2d at 314 ("[B]ecause Plaintiff has not established that [two defendant police officers] violated any constitutional right, his MCRA claim against them must also fail."). The only potentially viable basis for the MCRA claim is the Fourth Amendment violation for an unconstitutional stop, and that, too, must fail.

"Not every violation of law is a violation of the State Civil Rights Act. A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act." *Longval v. Commissioner of Correction*, 404 Mass. 325, 333, 535 N.E.2d 588, 593 (Mass., 1989) (citation omitted); *Columbus v. Biggio,* 76 F. Supp.2d 43, 54 (D. Mass., 1999) ("[A] direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do." (internal quotation marks and citation omitted)); *Lopez v. Com.*, 463 Mass. 696, 709 n. 15, 978 N.E.2d 67, 79 n.15 (Mass., 2012); *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 473, 631 N.E.2d 985, 989 (Mass.), *cert. denied,* 513 U.S. 868 (1994); *Nicholas B. v. School Committee of Worcester,* 412 Mass. 20, 24, 587 N.E.2d 211, 213 (Mass., 1992) ("The school committee's allegedly unlawful action here was direct and immediate. Even if that action had been unlawful, it contained no threat, intimidation, or coercion."); *Pheasant Ridge Associates Ltd. Partnership v. Town of Burlington*, 399 Mass. 771, 781, 506 N.E.2d 1152, 1158-59 (Mass., 1987) ("Although the purported taking of the plaintiffs' property was unlawful because done in bad faith, the taking did not itself interfere or attempt to interfere with

the plaintiffs' rights by coercion. The taking was an attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not to do anything."). In this case, the stop of the plaintiff's vehicle without reasonable suspicion, if that is found to have occurred, was a direct violation of O'Brien's Fourth Amendments rights. There was no interference "by threats, intimidation or coercion," Mass. Gen. L. c. 12 § 11H, and therefore no violation of the MCRA.

All of the purported threats, intimidation or coercion about which the plaintiff complains occurred *after* the stop on March 14, 2009, e.g., the purported surveillance and harassment by a police officer on August 16, 2011 (Plaintiff's Depo. at 35-39); a police officer following and harassing the plaintiff "after the events of 3/14" (Plaintiff's Depo. at 67-70); the second citation for an expired registration "some months" after March 2009 (#20 ¶ 24[19]; Plaintiff's Depo. at 70-71); the purported religious implications of the divorce discussion with Hamacher while O'Brien was in a cell after his arrest (Plaintiff's Depo. at 212-13), etc. Since these purported actions by the Scituate Police post-date the

---

[19]

On July 26, 2009, O'Hara observed that the plaintiff's vehicle was still unregistered and issued him a citation for that violation. (#20 ¶ 24; #20-1 at 182-83) O'Brien admits that his vehicle was unregistered at the time O'Hara issued the citation. (#20-1 at 181) The plaintiff challenged the citation and, after a bench trial, ended up paying the citation. (Plaintiff's Depo. at 185) The Court views the allegations surrounding the unregistered vehicle citation to be part of the "intimidating" and harassing conduct about which the plaintiff complains to support his MCRA claim. To the extent these allegations are supposed to support a separate constitutional violation, they clearly fail since it is undisputed that O'Hara was justified in issuing the citation for an unregistered vehicle on July 26, 2009.

stop, they *a fortiori* could not have been a source of interference with the plaintiff's right to be free from unlawful seizure on March 14, 2009. Accordingly, summary judgment should be entered in favor of the defendants on Count II.

### C. Count III: Intentional Infliction of Emotional Distress

In order to establish a claim for the intentional infliction of emotional distress under Massachusetts law, it is incumbent upon the plaintiff to prove

> '(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.'

*Limone v. United States,* 579 F.3d 79, 94 (1 Cir., 2009)(quoting *Agis v. Howard Johnson, Co.,* 371 Mass. 140, 144–45, 355 N.E.2d 315, 318-19 (1976)); *Young v. Wells Fargo Bank, N.A.,* 717 F.3d 224, 240 (1 Cir., 2013).

"Extreme and outrageous conduct is behavior that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

33

*Young*, 717 F.3d at 240 (internal citations and quotation marks omitted). Severe emotional distress means more than "mere 'emotional responses including anger, sadness, anxiety, and distress,' which, though 'blameworthy,' are 'often not legally compensable.'" *Kennedy v. Town Of Billerica*, 617 F.3d 520, 530 (1 Cir., 2010) (quoting *Quinn v. Walsh*, 49 Mass. App. Ct. 696, 732 N.E.2d 330, 338 (2000)).

As in the *Kennedy* case, the Court shall "bypass" whether the defendants' actions meet the required level of "extreme and outrageous" and "beyond all possible bounds of decency" and turn directly to the fourth element of the claim, the emotional distress alleged. *Kennedy*, 617 F.3d at 531 n. 10. In his deposition, the plaintiff testified that he did not seek any mental health therapy for distress related to the issues involved in this litigation until more than three years after the events. (#20-1 at 33-35) O'Brien testified that he suffered from "[f]atigue, insomnia, possible low level depression, and that has lowered [his] energy level in dealing with [the events surrounding March 14, 2009]." (Plaintiff's Depo. at 23) The plaintiff claims that his pre-existing asthma condition has worsened due to his encounter with the police on March 14, 2009, but no physician has opined a link exists between the two. (Plaintiff's

Depo. at 30) In addition, O'Brien has pre-existing high blood pressure and, although he believes that the ongoing problematic regulation of his blood pressure is related to the stressors arising from his March 14, 2009 encounter with police, no doctor has opined that the events of March 14, 2009 somehow worsened or exacerbated that condition. (Plaintiff's Depo. at 29-30) The plaintiff testified as follows at his deposition:

> Q. Has any doctor opined that any anxiety, heart palpitations, emotional distress, aggravation of high blood pressure, insomnia, loss of appetite, or nightmares is in his or her opinion causally linked to you encounters with the police since March of '09?
>
> A. No because I have not discussed it with my doctor.
>
> Q. Okay.
>
> A. I've discussed the conditions but not the events.

Plaintiff's Depo. at 216.

Addressing the standard of "'severe" emotional distress, "the kind of distress that no reasonable man could be expected to endure," the First Circuit has written that

> The strength of a standard is always a matter of degree, but the Massachusetts cases are demanding. *See Bailey v. Shriberg*, 31 Mass. App. Ct. 277, 576 N.E.2d 1377, 1379 (1991) (finding no 'severe' emotional distress, even for susceptible plaintiffs,

35

where the allegations merely involved being upset as a result of defendants' conduct); *cf. Homesavers Council of Greenfield Gardens, Inc. v. Sanchez*, 70 Mass. App. Ct. 453, 874 N.E.2d 497, 504 (2007) (finding 'severe' emotional distress where the plaintiff presented evidence of severe depression, suicidal thoughts, and loss of sleep for more than a month).

*Kennedy,* 617 F.3d at 530-531.

Viewing all of the evidence in the light most favorable to the plaintiff, O'Brien has failed to meet this demanding standard. As in *Kennedy,* the harms the plaintiff claims are generalized, "too transient, too vague, and insufficiently severe." *Kennedy,* 617 F.3d at 530; *see also Boyle v. Barnstable Police Dept.,* 818 F. Supp.2d 284, 309-10 (D. Mass., 2011). The three-year gap between the events in March 2009 and the time when O'Brien sought mental health treatment undercuts a suggestion that any emotional distress caused was by the plaintiff's interaction with police was sufficiently severe to support the claim. In short, summary judgment should entered for the defendants on the intentional infliction of emotional distress claim.

### D. Count IV: Conspiracy to Violate O'Brien's Fourth and First Amendment Rights

"In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual

abridgement of some federally-secured right." *Nieves*, 241 F.3d at 53(emphasis

in original); *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 14 (1 Cir., 2003).

Moreover, the plaintiff must identify the specific constitutional right violated.

*Nieves*, 241 F.3d at 53. Here, the only potential constitutional right violated is

the Fourth Amendment for the stop that occurred on March 14, 2009. In his

deposition, the plaintiff testified in the following manner with respect to his

conspiracy claim:

> Q. Now do you have any evidence, again not surmise,
> gut feelings, intuition, anything like that. Any facts
> that support the proposition that Bulman, Hamacher,
> and O'Hara got together and hatched any type of
> conspiracy to wrongfully prosecute you?
>
> A. Oh, yes.
>
> Q. What would they be, sir?
>
> A. Their own narratives from the post arrest record that
> I reviewed.
>
> Q. And that is insofar as it reflects that Officer Bulman
> had spoken with LaSala and had asked officers to be on
> the look-out for you?
>
> A. Part of it.
>
> Q. Is there anything beyond that?
>
> A. The conversations between Hamacher and O'Hara

at the time of my arrest.

Q. How do they implicate Bulman?

A. Oh, no, not Bulman, sorry.

Q. Listen to my question carefully. Do you have any evidence that those three people - Bulman, Hamacher, and O'Hara - got together and hatched a conspiracy to wrongfully prosecute you, the three of them together?

A. Only based on the narrative that Hamacher and O'Hara compiled after my arrest.

Q. Which again only reflected that Bulman asked officers to look out for you?

A. Well, their narrative, their narrative is stated that they had been instructed by Officer Bulman along with all the officers through a BOLO beyond (sic) the look-out which I still haven't been able to find. I don't know if it is provided to Attorney Grossack to be on the look-out for me in relation to the flyers that Bulman apparently wanted me to be picked up for questioning.

Q. You have no evidence that Bulman instructed or encouraged anyone to arrest you, do you?

A. Well he had the morning roll call and at the roll call he instructed officers to be on the look-out for me through a BOLO, which my understanding as a lay person is, from conversing with attorneys in law enforcement, is a process that is usually used to pick someone up or arrest them and bring them in for questioning, my understanding.

#20-1 at 192-94.

A conspiracy requires "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an *agreement* between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Williams v. City of Boston*, 771 F. Supp.2d 190, 204 (D. Mass., 2011) (internal citations and quotation marks omitted) (emphasis added); *Boyle*, 818 F. Supp.2d at 316. Although conspiracy claims often rest on inferences, "summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations" to support his theory. *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1 Cir., 2008), *abrogated in part on other grounds by Maldonado v. Fontanes*, 568 F.3d 263 (1 Cir., 2009); *LeBaron v. Spencer*, 527 Fed. Appx. 25, 33 (1 Cir., 2013).

Taking the evidence in the light most favorable to O'Brien, there simply are no facts to establish, directly or by inference, "a conspiratorial agreement" among the defendants to violate the plaintiff's constitutional rights. *Nieves*, 241 F.3d at 53; *LeBaron*, 527 Fed. Appx. at 33; *Estate of Bennett*, 548 F.3d at 178. As a consequence, summary judgment for the defendants should enter on the

conspiracy claim.

## V. Recommendation

For all of the reasons stated, I RECOMMEND that the Defendants' Motion For Summary Judgment (#18) be DENIED with respect that part of Count I alleging the traffic stop violated the plaintiff's Fourth Amendment rights. In all other respects, I RECOMMEND that the Defendants' Motion For Summary Judgment (#18) be ALLOWED.

## VI. Review by the District Judge

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*,

702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ *Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

March 3, 2014.